May it please the court? Yes, sir. Thank you, your honors. Good morning. Mark Crum on behalf of Laura Blankenship and Monty Mandarino on behalf of their decedent son, Alex. Your honors, thank you for the opportunity to address the court this morning. For three years while preparing this case, the plaintiffs relied and framed their case strategy around, as and Billington v. Smith, the Ninth Circuit's provocation theory. And you now know that rug has been pulled out from under you by the Supreme Court. I'm now well aware that I feel almost literally the rug was pulled out from us with regard to the Supreme Court. Okay, but the court did say, and we had actually yesterday afternoon arguments in Mendez on the issue that was left over, left open by the court, that is proximate cause. You haven't made such an argument here, as I understand. You haven't made an alternative argument, even after Mendez came out. No, your honor, we did not. Okay. So let me, let me try to break your case into, into time frames, if you will. I want to understand the effect of your concession. There's a concession that the last 15 seconds, the police officers acted reasonably. Is that a fair statement of what you said? I don't want to use the word unfortunately, Judge, but clearly that was our strategy for three years. Okay. A strategy. But it's a litigation strategy that comes, the case comes to us in that context. Right. I still, I still distinguish litigation and trial, being a trial lawyer. Fair enough. It was a trial strategy. Trial strategy. For credibility purposes. Fair enough. And I, I take your distinction. Thank you, sir. So if I focus on everything but the last 15 seconds, which is what's left in the case, tell, tell me why the police officers' conduct during that period violated clearly established law. Judge, I believe that in the record there are many sites in the plaintiff's opening brief. Well, no, I've read your briefs. Here's, and let me, let me be, if I can take just maybe 30 seconds of your time, I just want to lay this out. It's your time, Your Honor. The, the, the police officer comes on a car. He, he doesn't have any particular reason to stop it, but he's heard there's an accident. He, before he comes to the car, he runs a plate and it doesn't match the car. Correct. He then asks the driver of the car for registration. The driver doesn't have, says he doesn't have registration. He smells marijuana coming out of the car. Things proceed. A second officer arrives. It's discovered that, that the person in the car has switched the plates. It's discovered that the person in the car has a suspended Washington license. And all this takes less than an hour. So I'm trying to figure out what constitutional deprivation occurred during that hour. Now, in the last 15 seconds, something violent happens, but you've, you've, as you've said, you've made the strategic decision not to focus on those 15 seconds. So tell me what, what the constitutional violation is that occurs during everything but those 15 seconds. I will, but I just want to state to the court that we did take that position below in the district court. I'm not so sure that we're forced to take that position now. Well, and I can, it seems to me, you can't ask us to reverse the district court because you've changed your mind. The district court made a ruling based on a position that you took. And so it's therefore difficult for us, it's difficult for me to say, we should say to the district court, well, he's changed his mind now, go do it all over again. But so for purposes of my question, you can come back to your second point. Tell me what was wrong with the encounter, constitutionally wrong with the encounter up until the time of the shooting? Yes, sir. Um, well, I took the inflection of your tone, your honor, as though to your honor, the hour here are approximately 48 minutes, right? So that was not, was not a long time. And I would argue strongly that it was a very long time, even though they're investigating, they think they may have a stolen car. They then discover that the guy in the car has not been telling them the truth about various things. He has a registration, even though he's told them he doesn't have one. They think there's marijuana in the car. He tells them that he switched the license plates. Um, surely there's some period of time that they're, that they're allowed to investigate this now. Uh, well, of course, your honor, uh, being a former assistant U.S. attorney, there's, there is time and for law enforcement, they need to know whether a crime is afoot and whether or not they need to detain. Um, they learned that relatively shortly here based upon the officer's testimony. You may have done something different. I may have done something different as law enforcement, but these officers testified under oath that from moments from the time they got there, Alex was never leaving that morning, but in handcuffs and the record clearly supports. So what's wrong with that? Once you find somebody with a car with what appears, what appears to be a stolen car and he can't explain why the plates are not, he can't satisfactorily explain why, why he's driving a car with plates that are not for the car. Well, what, what I believe your honor is wrong with that is that this was an example of this case of law enforcement knowing that they were going to arrest someone, I'll be it even for something that he didn't do, but what they thought he may have done and didn't do that for the sole purpose of trying to get further incriminating statements. So let me ask you, suppose you're all right about all that. I still don't understand how after Mendez and given your concession about the 15 seconds, and I know you think we shouldn't be bound by it, but let's assume for the moment that you are, what's your case? All right. Suppose the, the, there were constitutional violations involved in keeping them as long as they did. Then what? Uh, that, that our case is that a reasonable officer would have used less intrusive means in the last seconds when the, when the firearm was spotted by law enforcement. All right. So you're going, so therefore your case depends on now on lifting the concession about the last 15 seconds. Well, yes or no. I'm not being bound by that because everything that happened before that, um, you know, because you're not making any kind of proximate cause argument. I mean, if you got up here and said, well, look, I didn't know about the proximate cause argument. I thought I could get by with a, with, I thought I could rely on provocation. So I want the alternative, but you've never, you haven't done that to this day. So therefore I don't see why anything about what happened up until the actual shooting is pertinent. Well, I'm not saying now that it is based upon Mendez. All right. So the whole, the whole colloquy you just had with Judge Hurwitz is irrelevant. Well, I don't want to say that to his honor. He asked me a question and I answered it. You can say it, just to answer a question. The answer to your question is I, I think it may be. I think it very well, I'm having a difficult time saying yes, but I'll say yes. So in answer to my question of whether you can get, on the current posture of the case, if we regard you as bound by your concession about the last 15 seconds, you have no case. Well, you asked me a question before that. That's my question. It's the same question a second time. Sort of the question I was trying to ask myself. Maybe she did better. I'm not, I can't change our position, Judge, when we say that if, if I, if I was a better lawyer at the time with a little more foresight, I would have said with our new end up. I understand that. We're a better circuit, the provocation argument might still be here. That's not the issue. The issue is. My point is that, if I may, in attempting to answer your honor's direct question, I should have said for argument's sake, we're not going to contest the last 15 seconds. But it's a yes or no answer. In other words, your case at this point, all we really should be talking about and all we should be talking about is whether you're bound by your concession on the 15 seconds, because if you are, you don't have a case. Well, let me answer that. Okay. Thank you. Well, if I'm bound on the last 15 seconds that we said that the officer's actions were reasonable in the last 15 seconds for purposes of the decision and the appeal, factually, that still is something that we would argue would be before the jury. We can stipulate. I've had cases that I've tried where we've stipulated and juries have disregarded stipulations and facts, and facts still go before the jury. All right. So let's assume for the moment then, you say there is some argument for why you shouldn't be bound by it. Let's assume that for the moment. All right. Then, if you look at the last 15 seconds, why was there excessive force? And that goes to, we would argue there that the court is now, if the court's making decisions on facts that we believe were well material and inferences can be drawn to reach a different conclusion than a district court judge. The facts are not disputed. We have a videotape of what happened. And so the question is whether or not under the immunity doctrine, because this is a 1983 case, it is there's some clearly established law that would have led these officers to know that they were acting unreasonably. So what we have is a guy who takes a gun out of a glove compartment. The cops may have acted too quickly. After they were told not to. After he was told not to. The cops may have acted too quickly. It may have been bad police work. But if we focus on the shooting and ignore your previous concession, my question is what case tells me what, because we're at the summary judgment qualified immunity stage. What case, what clearly is cases that clearly established law that you think tells those police officers that once a suspect takes a gun out of a glove compartment after being told not to, and then is again, warrants, put it down that they can't resort to deadly force. Um, I'm going to answer right away. I don't have that case, but I do have facts that I strongly disagree with your honor's conclusion on them. And I would ask the opportunity just for a minute to tell you, go ahead. Sure. Thank you. The gun, the, the, uh, defendants, the appellees testimony, uh, state in their brief that the gun was pointed at McDevitt. There was no testimony, um, during three days of depositions that the gun was ever pointed at McDevitt. In fact, there was testimony by deputy Durflinger that it wasn't. So these are facts that we're allowed to do in a declaration. Assume those to be true. Assume that those are the facts that we take to be true still. I'm still looking for the case that tells me under those circumstances, this is an unreasonable use of force. Oh, I can't give you, I don't like the Supreme court's jurisprudence on this issue, by the way. We just got reversed on this case of the woman who had a knife on her, by her side, a kitchen knife, which is not even necessarily a wick, but in her own front yard, uh, and didn't threaten anybody. And was, and the only evidence was they told her to drop the knife and she didn't. And that was determined to be within the qualified immunity privilege because there was no case in which a similar thing had happened. I understand that. This one seems considerably more egregious, right? Because I don't, I don't, I don't necessarily agree with that. First of all, it was a gun. Second of all, he was specifically told to get out of the car and he got in the car. He was told not to get, go for the gun and he went for the gun. Um, so what were the, do you think the police thinking that he was going to use the gun was unreasonable? Why else was he going for the gun? That's what I'd like to answer, if I may. Why we believe the facts create inferences, real inferences based upon the testimony that when he went back into the car, he was told not to go for the gun. He was also told not to go in the car. Right. And they let him into the car five times. But then he said, don't get in the car and he got in the car. Let's talk about the last 15 seconds as you've instructed me to do. Alex goes ahead and he wasn't told to hand him the marijuana bottle either, but Alex goes ahead after the officer said, don't touch the gun.  After he was given that instruction, our argument is in Alex's mind. There's inferences for a reasonable jury to conclude that he was then going to hand the gun to the officer. But the officer says after that, don't touch the gun. No question. And we also, he also says, after he touches the gun, give me the gun. Please let me just answer. May I answer one question, either or first. Start with me. I asked first. Okay. Thank you. The officer does say that. No dispute. Because we've listened to the dash cam. Judge, everything I'm arguing now is based on the dash cam. Right. Okay. Nothing else. Yeah. Okay. That's how I crossed for three days of depositions, as your honors are aware, I mean the transcript going through every second of that. So just, so now. Let me answer the question. You just didn't answer it. You said he did say that. And so my question is. Well, one officer did. The other officer said that he never knew that McDevitt drew the gun. He thought Alex shot himself. He never thought that McDevitt even shot. And the officer testified that Alex may have been confused and disoriented and specifically said Alex may have not, quote, understood, unquote, what the officer said at that point in time. It's a great jury argument. I take all this as true. My question is, even if taking all that is as true, once a suspect reaches for a gun after being told not to, whether or not he points it at the officer, and then is told again, put down, put down the gun and doesn't do it. Give me the case that tells me that the police act unreasonably at that point by using, using deadly force. That's what the Supreme Court tells us we have to have. A case to some level of specificity under those facts that says deadly force is unreasonable. You candidly said you couldn't find one. I'm looking and looking, and I can't find one. All I have, Judge, is what Judge Berzon just said, the Kelsey case that just came down in April. And all I have is the dissent in that case. That's all I have. Great. Dissents don't do very well. No, they may not. I mean, they were right in my view, but they still don't do very well. No, no. But, but I'm asking this court to not do what every court seems to do on these cases, what's clearly the dissent set forth in the case we're referring to. To be candid, this court, the Ninth Circuit, tried a different approach to these cases and was told by the Supreme Court, don't take that different approach. And so that, all that occurred while this case was on appeal, obviously, but that's, that's the difficulty with that argument in my view. I understand, and I don't want to be here arguing against the Supreme Court. We can, but you can't. With all due respect to the court, but I can do whatever I have left on the last 15 seconds. And because that statement was made, if this court were to remand it, I understand as a trial lawyer that I'm going to be faced with the defendants being able to show under 801 D2 of the Federal Rules of Evidence that we made an inconsistent statement at one other time. And that was that we said at one point in this brief that these facts were not in dispute. That's what's something I'll have to deal with as a trial lawyer. I'm arguing before the court now that I'm not, I'm not, I don't like having to do this. But you see, the larger problem is that you made that concession for a reason, the reason being that it's probably right. That's the problem. Right? Well, with all due respect, I made the decision as a trial lawyer saying that after 22 years of Alexander, that I felt comfortable that the best way for having credibility in front of a jury would be to not talk about the last 15 seconds. Okay. Thank you very much. And thank you for your argument. Thank you for your honor's opportunity. Okay. Good morning. May it please the court. My name is Catherine Brereton and I represent Adam Derflinger in the Shoshone County Sheriff's Office. I am joined today by my co-counsel Peter Erblin and by counsel for Todd McDevitt, Peter Johnson. I will be addressing the court for 10 minutes and then I will yield five minutes of our time to Mr. Johnson and I will keep track of my own time for that. There are three principal reasons why the decision of the district court was correct. First, as the court has noted, the estate conceded at the district court and in its opening brief that the use of deadly force was reasonable. Does the fact that, as he just said, 15 years of precedent was reversed and therefore the legal premises on which it was operating disappeared affect the viability of the concession? I believe that the concession does affect the viability of the claim. I'm sorry, what? I do believe that the concession stands here. It affects the viability of this claim. The claim does not go forth. I will point out that the district court, even with the concession in the opening brief and even with concession at the district court in their response to the summary judgment, the district court analyzed this case under Graham and further analyzed this case under the provocation theory and it found that the shooting was reasonable. Can I focus on your client for a second? Yes. He was not the shooter? No. So, I'm having a hard time figuring out what his, what the, even putting aside the concession, what the civil rights claim against your client is. What do you understand it to be? My understanding is the proximity of his, the fact that he was there at the scene. That he was doing what? That he was, the fact that Deputy Derflinger was present at the scene. He didn't have any role in the actual fatal shooting, correct? He was there for cover. Right. I mean, but he didn't, he wasn't wrestling with the gun. He didn't pull, he didn't shoot his weapon. No, Your Honor. He was part of the detention that led up to this point in time. But, so once we take the provocation theory out of the case, even if we only focus on the last 15 seconds and ignore the concession, I had a hard time figuring out why your client is responsible for what happened in those last 15 seconds. I understand why Mr. McDevitt is responsible. It may be blameless. He may not be. But, I don't, I'm having a hard time focusing on why your client is responsible. Well, I have two clients. The Sheriff's Office. Right, right. But, the Sheriff's Office liability flows from, in this case, I think, the argument that Mr. Derflinger, or Officer Derflinger, or Deputy Derflinger, did something wrong. Correct. Let me ask you something about the concession. As you point out, the district court did go to the merits of the Graham claim and didn't seem to rely on the concession. Did he rely on it at all? Your Honor, I don't believe that he did rely on . . . Therefore, why should we? I think that it has preclusive effect, given the arguments that are made. I'm sorry, I don't understand that. If the district court didn't regard it as binding, why are we? I think that . . . Isn't it a discretionary matter for us? We often say an argument wasn't raised in an opening brief. We have the discretion to ignore it, but we won't. So let's assume that we did. Assuming that it's a discretionary matter, and assuming that the concession does not apply, the district court was still correct in its holding, and still correct in its finding that the use of deadly force was reasonable. The district court, I think, in this case, found an absence of a constitutional violation? Correct. Do we need to find that? You can address either prong. You can address the qualified immunity, that there's no clearly . . . The Supreme Court told us we ought to address the qualified immunity prong first, because otherwise we may be creating constitutional rights that we then find are subject to qualified immunity? That's true, Your Honor. And the court has said that if there's no clearly established law that controls this On either prong of this case, there was no constitutional violation, and they are entitled to qualified immunity. And again, I want to focus on your client in particular. Yes. Am I right in thinking that, and I've watched the last 15 seconds, for more than 15 seconds, he seems to just be still just standing out there yelling, as opposed to doing anything that applied the deadly force? That's correct. There's no allegation in this case that they planned in concert to use deadly force? That's correct, Your Honor. So, maybe I should have asked Mr. Crum about this, but I'm having trouble focusing on that defendant and finding that there's any evidence in this record, even assuming there was a constitutional violation, that he did it. So Your Honor, this issue wasn't briefed in the lower court in . . . That's why I'm asking. Yes. I'm in trouble. I'm just looking at this record. It is my understanding, and forgive me if my understanding is a bit brief on this, but it's my understanding that when an officer is present at a scene where there's a use of force or something like that, the Ninth Circuit has analyzed these cases that there is some sort of nucleus of time that renders the officers who are present an integral participant in the situation that renders them potentially liable for the constitutional violation. It could be, for example, if they were a set of officers there and nobody gave a warning. So therefore, all of the people who didn't give a warning, knowing that there was a possibility of a shooting, might be liable. But in this instance, there was a warning. I mean, it seems to me what really happened here, and the reason why nobody's focused on this, is that the provocation theory assumed that what happened before the shooting was the pertinent question, and your client was a participant in that activity. And really what Judge Hurwitz is saying is, if that's no longer the case . . . Correct. I would . . . Even if it were still the case, can you address that for me, because I tried to ask Mr. Crum that. Address everything that happened before the shooting, and tell me why, in your view, there was no constitutional deprivation during that time period. So everything that happened before the shooting. This court has recognized, and the Supreme Court has recognized, that an officer may conduct inquiries incident to the traffic stop. The detention of Mr. Mandarino was reasonable from the inception of discovery . . . For a traffic stop? This did not start as a traffic stop. This started as a welfare check on . . . They're perfectly entitled to check and see what's happening, and they find out that the car has plates that don't match it. Yes. I take it Mr. Crum's argument is either they should have . . . if they wanted to arrest him, they should have done it beforehand, or they should have let him go. I'm not binding him to that argument, but assuming that's his argument, what's your response to it? My response is that this court said in United States v. Turvin that a driver does not have the right to be released the instant the steps check his license, his registration and warrant, and to write a ticket to have been completed. And this court has also recognized that an officer is entitled to continue to make inquiries when he is at a traffic stop, when the suspect is giving inconsistent, evasive, misleading statements. The fact that this wasn't a traffic stop, it wasn't a traffic stop, is of some relevance, because they . . . when they went up to him, they were not obtaining him for any reasonable suspicion of any crime, right? I disagree, Your Honor. When they went up to him to begin with? Your Honor . . . Before they checked the plate. Before what? Before the police officer checked the plate before he approached the car. Yes. Before he checked the plate, there was no reasonable suspicion, was there? So just to be specific, the timeline is that Deputy Derflinger arrived at the scene at approximately 11.07 a.m. He starts his dash cam video, and he goes up and walks around the car that Mr. Mandarino is in to check and see if this is the car that he believes may have been involved in this car accident that was called into Shoshone County Dispatch. Before he got out of the car, he radioed dispatch and asked them to run the plates on the car. When he returned to the car after observing the car, that it was not the one that was involved in the crash, that is when he learned that the license plates that were displayed on the Scion were not those that belonged to it. So, in response to Judge Berzon's question, the answer is that at least until he checked about the license plate, there was no reasonable suspicion? At least until he received the information from his dispatch, there was a reasonable suspicion, and this was a motorist assist, and Deputy Derflinger testified as much that if he had returned to his car and had never received that information from dispatch, he would have cleared the scene and went on his way. However, this situation transformed from a motorist assist, and Deputy Derflinger had a reasonable suspicion that something was awry when he received that information from his dispatch that the license plates that were displayed on the Scion were... And then he has conversations with the driver, which are unproductive? Yes, Your Honor. He doesn't have registration? He's got something with a VIN number on it? Yes. Says it's a receipt? Yes. He can't... He doesn't produce the registration. He can't contact the owner of the car? Yes, he can't contact the owner of the car. Mr. Mandarino first said that he was the owner of the car, and then he informed Deputy Derflinger that no, he didn't own the car, but that was only after Deputy Derflinger said, this car belongs to someone else who is not you. And Deputy Derflinger informed Mr. Mandarino that it was Mr. Potratz, Mark Potratz, and Mr. Mandarino had no response to that. If you want to give your colleague some time, you're running out. Yes. Thank you so much for your time. Excuse me. Good morning, and may it please the Court and Counsel. My name is Peter Johnson. I represent Trooper McDevitt. Based upon some of the questions I've already heard and some of the exchanges, I'm not going to follow my script. We always do a script, and then pretty much you're off script very quickly. So I'm not going to talk about the concession and the impact on that. What I'm going to start with is the fact that the district court in this case correctly analyzed the case pursuant to Graham and held that there was no clearly established constitutional right that was violated, viewed all of the evidence, and I'm talking about evidence, the facts, in the light most favorable to the plaintiffs, and even did a provocation rule analysis and didn't apply that as an exception to change what was conceded. And what the court found was a justifiable act by the court. But the district court never mentioned the concession. Is that right? Yes. It didn't. So it didn't even consider the concession. So outside that, analyzing everything, it determined that the officers had acted reasonably. And what I want to... Why don't we, why shouldn't we on appeal ignore what counsel now says he wish he hadn't done, which is make this concession? Why shouldn't we address the case on the merits? That's exactly what the district court did, is it addressed it on the merits. As Judge Berzon just pointed out, the district court didn't focus on the concession even though it was in the briefing. It didn't even mention it. It didn't even mention it. So it focused on the merits. And what I want to do is take a minute to go through the material facts that really the court focused on. First and this is supported by all the case law, the officers had to react in a split second. Second, this is unlike some of the other cases where they talk about proximity, how close was the individual when, as the judge pointed out in the Hughes case, that was a, that was one of the arguments in the Hughes-Casella cases. Well, the person was on the other side of the fence. No, they weren't. That's not true, but go ahead. It's not worth it. I may have misstated the wrong case. He wasn't on the other side of the case, but there was no claimed danger to the police. The police were fine, but the claim was the danger to the other person. Correct. Yes, Your Honor. This isn't a situation where we have a knife versus a gun. Okay? You know, we have a situation, Your Honors have looked at the video, but there's no time for a retreat here. They're standing right next to the car. There's no place for them to safely retreat. You know, Mr. Mandarino, as the court has pointed out, became passively resistant when he was twice told to move to the back of the scion and ignored those warnings. And I understand that that's not a basis for them to use deadly force, but that begins to start his further uncooperation. When the pistol was observed in the glove box... And the reason he had an obligation to listen to them at that point, is he was under arrest or why? As the officers testified, at that point he was under arrest. The reason the officer indicated that he was... He was or he was not? He was not under arrest when the officer asked him to move to the back, told him to move to the back of the car. He was detained though and he had an obligation to follow her orders? He has a... Yes, he does, but he can passively... The point is, is that the case of passive resistance isn't a justification for using deadly force. Well, I mean, this is an issue I've had with other defense lawyers, but if I'm walking down the street and a policeman tells me to do something, I don't have to do it, do I? No. All right. Because he has no reason to be detaining me. So you have to be resting on the fact that there was at least a basis for keeping him in... Well, sure, and... In a carry stop sense, is that what you're saying? Well, yes. And even though, as you pointed out, this didn't start out as a traffic stop, there was a reasonable basis for the detention. And as the judges pointed out, this was actually 40 minutes, 30 minutes of which Trooper McDevitt was there. And if you do the timeline on this thing, you will see that the prolonged timeframe was all caused by Mr. Mandarino's deceit and, in fact, lies. What if Mr. Mandarino had told the truth from the beginning? He would have been arrested, would he not? At some point, the determination, yes, he probably would have been arrested. And your colleague says that the police officers essentially said, we knew we were going to arrest him much earlier on in the transaction than the shooting occurred. Even if you assume that, there's no constitutional violation. You don't have a right to be arrested. They had a right to continue their investigation based upon what Mr. Mandarino was not telling them. He was not telling them the truth. He was making up stories as he went along. We don't know why. That is the fact. That is the fact that he was making up things as he went along. You know, and I want to continue with this. You know, when the pistols observed, okay, and, you know, we can argue about it, and I think one of you said that, well, maybe they didn't act, they acted too hastily. That's not the case at all. There was no panic by the officers when that pistol was first observed. In fact, there was a very clear and articulate warning, don't go toward that pistol. It was a little bit more threatening than that. It was pretty stern, you know. It wasn't don't go towards that pistol as if you touch that pistol, it will be the last thing you ever do. And I was going to get to that. Not only was there a warning not to go toward the pistol, but there was a warning as to the dire consequences would be if you did. He becomes, Mr. Mandarino becomes actively resistant when he refuses to comply, ignores or does not acknowledge that order. And, you know, it isn't like there's, if you look at the tape, there's probably about a seven second lapse before he, when he's transferring this, what he claimed to be the marijuana and his pill bottle to the officer. And you can see when that glove box is first opened up. Deputy Durflinger takes a kind of a as ready stance. He puts his right hand on his weapon, doesn't draw his weapon at that point. Neither one of the officers pull their guns and shoot Mr. Mandarino as soon as they see the pistol. He's given the warnings. He's told don't go near the pistol. He's told what the consequence is going to be. The pill bottle is handed out. And as you watch, as that's happening, he grabs the weapon. You know, Deputy Durflinger draws his weapon, but he still doesn't, use the word over, he doesn't shoot Mr. Mandarino. He readies himself. Trooper McDevitt doesn't draw his weapon and shoot Mr. Mandarino, even though he has now got, he tries to, he acts with great restraint. He tries to disarm him by lunging into the car and trying to wrestle control. Now, there was testimony that the weapon was pointed toward, on several occasions, toward Trooper McDevitt's face or body. And he first is successful in pushing the weapon away from him, which is when Deputy Durflinger testified that he saw it. Yes, Your Honor. You have a question.  I'm talking as fast as I can. No, I have a question. I want to tell you that you're out of time by two and a half minutes. So, thank you very much. All right. Thank you. You may have a minute. Yes. Thank you, Judge. Three points, Judge, based upon the questions that I heard and the answers given. Mr. Mandarino was killed, based upon the tape that you watched, at 11.48 and 41 seconds. With 10 seconds earlier, if you listened to the tape, as you did, I had to listen 50 times to what I'm about to tell you now. The plaintiff's position is that McDevitt was heard saying, do you understand me, to Mr. Mandarino. And Mr. Mandarino says, no. Now, McDevitt says he didn't hear that. Durflinger says, I don't know if that's what was said or not. Assume that's the case. Ten seconds. Assume that's the case. I've listened to the tape, and it's not clear to me who's saying no. But it's an inference, Judge. Okay. So fair enough. So your client says, the police officer says, in effect, put down the gun or I'll have to shoot you. Do you understand me? And he says no and keeps the gun in his hand. Why does that change the calculus? Because the plaintiff — You have somebody now who doesn't even understand the order. And that's why the plaintiff's case, which we believe can clearly be established on the inferences, that just like the pill bottle that Trooper McDevitt did not ask for, Mr. Mandarino voluntarily took it and handed it to him. And that's what Mr. Mandarino was doing with the gun. And based upon the physical evidence, if you'd watch the video depositions of the transcripts, you would see, as we put in a footnote, that it wasn't — Was there any language problem here? I don't — I need to tell — as an officer of the court, I do not know of any language problem. There were long discussions before that. Clearly. Clearly. But that doesn't change what occurred and that he did when McDevitt was saying what he said, as Your Honor pointed out. You touch that and it will be the last thing you ever do. But he was just voluntarily handed a pill bottle. Just two points I wanted to make before I sit down, but I can answer whatever Your Honor is asking. Now you're out of time. You are out of time. So thank you both very much. All right? One point. One second. Okay. One point. I'm — you know, the rug was pulled out from underneath me, Your Honor. Triple Rick Devitt has testified that Mr. Mandarino was never free to leave. Never free to leave from when he got on the scene. And therefore? That is in the record. Okay. That makes it, I mean, more obvious that he — that — I mean, if they said otherwise, I wouldn't — as I said before, I don't know where his obligation to follow their orders was, but it was pretty obvious that he wasn't free to leave. Right. And Rodriguez, the Supreme Court, says that the government — their position does really be that it was a traffic stop and that the Supreme Court has said in the last two years a prolonged traffic stop to conduct a non-traffic-related task. So long as the officer is reasonably diligent in pursuing traffic-related purposes of the stop, it's not — it can't be done. The problem is, as Judge Berzon said before, and I don't want to extend this too long, that this wasn't a traffic stop. This was a case in which they stopped to see whether there had been an accident, and all of a sudden they received information, the first officer received information, that there was something wrong, that the car's license plate didn't match the car. So then he had some reasonable suspicion that some — there was some sort of violation. So all these cases about how long one can keep somebody to give a ticket for a traffic stop don't seem to be very helpful in a case in which the cascading set of events tell the police officers that somebody's got marijuana in the car, he's got a suspended license, he's got — Mr. Mandarino never said he had no marijuana in the car. Well, the police officer said he smelled marijuana in the car. Correct. Yes, sir. And he switched license plates. Yes, sir. And he's under suspension. So this cascading set of events is not a traffic stop to investigate a violation of the traffic law, but rather to investigate what appears to be a very suspicious situation. Agreed, and my last statement is, but it's a cascading set of events that law enforcement put in place to get more incriminating statements when the suspect knew he wasn't free to leave, as they've testified, and they testified that he wasn't free to leave. All right. Thank you very much. Thank you. Thank you both. An ultimately sad case, whatever the result. Blackenship v. McDevitt is submitted. We will take a short break. Thank you.
judges: Thacker, Berzon, Hurwitz